Filed 12/14/22; Certified for Publication 1/5/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SHUSHA, INC., | B313907 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV25769) |
| v. | |
| CENTURY-NATIONAL INSURANCE COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel J. Buckley, Judge.  Reversed.

Hecht Partners, Katheryn Lee Boyd, Kristen L. Nelson; Law Offices of Jonathan A. Sorkowitz and Jonathan A. Sorkowitz for Plaintiff and Appellant.

Berman Berman Berman Schneider & Lowary, Spencer A. Schneider and Karen E. Adelman for Defendant and Respondent.

————————————————

Shusha, Inc., dba La Cava (La Cava) appeals from the judgment of dismissal entered after the trial court sustained without leave to amend the demurrer filed by Century-National Insurance Company (Century-National) to La Cava's first amended complaint. La Cava sued Century-National for breach of an insurance contract and related claims after Century-National denied coverage for La Cava's lost business income as a result of its suspension of restaurant operations in March 2020 due to the COVID-19[1] pandemic and associated government shutdowns.

On appeal, La Cava contends the trial court erred in concluding the alleged presence of the COVID-19 virus in its restaurant did not constitute "direct physical loss of or damage to" the restaurant necessary for coverage under the terms of the policy at issue. La Cava also argues Century-National acted in bad faith by summarily denying coverage without investigating La Cava's claim. We agree La Cava's allegations that contamination by the COVID-19 virus physically altered its restaurant premises were sufficient to withstand demurrer, and we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Century-National Insurance Policy*

As alleged in the operative first amended complaint (complaint), La Cava purchased from Century-National a

_____

[1] For ease of reference, we refer, as do the parties, to the SARS-CoV-2 virus, its variants, and the coronavirus disease caused by them as COVID-19.

"commercial package" insurance policy, including commercial property insurance and general liability coverage for a one-year period beginning November 22, 2019 (the policy).  A copy of the policy was attached to the complaint.

Section A.1 of the "Business Income (and Extra Expense) Coverage Form" provided in relevant part, "We will pay for the actual loss of business income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'. The 'suspension' must be caused *by direct physical loss of or damage to property* at premises which are described in the declarations and for which a business income limit of insurance is shown in the declarations . . . ."  (Capitalization omitted and italics added.)  "Suspension" was defined to mean, in pertinent part, "[t]he slowdown or cessation of your business activities." The "period of restoration" was defined in part as the period that "begins with the date of direct physical loss or damage caused by or resulting from any covered cause of loss at the described premises" and ends on the earlier of "the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality" or "one year immediately following the date of direct physical loss or damage caused by a covered cause of loss."  (Capitalization omitted.)

Section A.5.a of the business income coverage form also included civil authority coverage.  This provision provided, "We will pay for the actual loss of business income you sustain and necessary extra expense caused by action of civil authority that prohibits access to the described premises *due to direct physical loss of or damage to property, other than at the described premises*, caused by or resulting from any covered cause of loss." (Capitalization omitted and italics added.)

3

B.    *The Complaint*

La Cava filed this action on July 7, 2020.  The first amended complaint alleged causes of action for declaratory judgment, breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair business practices in violation of the Unfair Competition Law (UCL; Bus. & Prof. Code, § 17200 et seq.).  Each cause of action was premised on Century-National's denial of coverage for business income losses claimed by La Cava as a result of the COVID-19 pandemic.

La Cava is a restaurant in the Sherman Oaks neighborhood of Los Angeles.  As alleged, La Cava "promptly shut down operations" on or around March 16, 2020, "[o]nce the La Cava management was made aware by [pandemic-related government orders] of the clear and present danger of the virus and its existence everywhere in LA County, including on the surfaces and in the air in and around La Cava's premises."  On April 1, 2020 La Cava reopened with limited hours for take-out and delivery only, "prohibiting customers from dining in."

The complaint described and attached several government orders relating to the pandemic.  On March 4, 2020 the Governor of California declared a state of emergency due to the rapid spread of COVID-19 in California, and on March 15 the Mayor of Los Angeles issued a public health order prohibiting restaurants in the city from serving food on their premises.  On March 19 the Governor issued Executive Order No. N-33-20 requiring residents of California to stay in their homes, with limited exceptions.  Also on March 19, the Mayor issued a "Safer at Home" public order, finding "the COVID-19 virus can spread easily from person to person and it is physically causing property loss or damage due to

4

its tendency to attach to surfaces for prolonged periods of time." (Capitalization omitted.) The Mayor's order provided restaurants could offer food to customers "but only via delivery service, to be picked up, or drive-thru." In May, restaurants were again permitted to serve customers on-site by moving all dining outdoors, limiting group size, and spacing tables, among other restrictions. However, on November 22, 2020 the Los Angeles County Department of Health suspended outdoor dining at restaurants, and the Governor did not lift statewide stay-at-home orders to allow restaurants to reopen for outdoor dining until January 25, 2021.

The complaint included numerous allegations concerning the transmissibility of the COVID-19 virus and unfolding pandemic in California. Citing reports by the World Health Organization (WHO) and the Center for Disease Control and Prevention (CDC), the complaint alleged the COVID-19 virus can spread through "[f]loating respiratory droplets, called aerosols" that "behave like smoke," and it can both "'linger in the air for minutes to hours'" and also "travel[] on air currents until they attach to an object or other surface." The WHO and CDC "have recognized the tendency of the [COVID-19 virus] to attach to objects and surfaces, 'such as tables, doorknobs, and handrails,'" and the virus "'may remain viable for hours to days on surfaces made from a variety of materials.'" The complaint alleged further, "Numerous other scientific studies have discovered that the [COVID-19] virus can survive and persist on surfaces and buildings for nearly a month." Moreover, "The scientific community has confirmed that coronavirus and COVID-19 alter the conditions of properties and buildings such that the premises are no longer safe and habitable for normal use. Without

5

substantial physical alterations, systems changes to facilities, and new protocols for air circulation, disinfection, and disease prevention, an infected property cannot remain open to the public. Cleaning of surfaces alone is insufficient."

Specifically, according to one WHO publication, the COVID-19 virus "adheres to, attaches to, and alters the surfaces of the property and surfaces upon which . . . physical droplets land, and physically changes these once safe surfaces to 'fomites.' Fomites are objects, previously safe to touch, that now serve as agents and [a] mechanism for transmission of deadly, infectious viruses and diseases." "Thus, the coronavirus and COVID-19 physically change properties and surfaces such that contact with these properties and surfaces, which previously would have been safe, is now deadly and dangerous. This constitutes real and severe damage to and loss of the properties."

The complaint alleged La Cava suffered physical loss of or damage to its dining rooms and other property "caused by the actual presence of virus droplets in the air and on the surfaces in the vicinity of and in [its] restaurant" and "in the form of virus matter present on walls, floors, tables, chairs, silverware, dishes, and other surfaces." The complaint identified 10 commercial businesses, including three restaurants, in Sherman Oaks and its environs, where employees contracted COVID-19. Three of La Cava's employees suffered from COVID-19 in December 2020 and January 2021. The complaint alleged on information and belief that "La Cava is aware that it entertained customers since March 2020 who subsequently tested positive for COVID-19 and who had the ability to use the restroom facilities during the time they were outside dining." "[T]he virus . . . is therefore certain to have been present at La Cava at various times," and "droplets

6

containing SARS-CoV-2 have been physically present at the La Cava restaurant premises insured by the Policy at all relevant times."  The complaint alleged further in paragraph 81, "The presence of droplets containing coronavirus at La Cava led to its closure and constitutes covered physical damage to [La Cava's] premises.  Once the La Cava management was made aware by the Orders of the clear and present danger of the virus and its existence everywhere in LA County, including on the surfaces and in the air in and around La Cava's premises, it promptly shut down operations."

In addition to lost business revenue due to the suspension of operations, La Cava "incurred substantial costs in an attempt to mitigate the suspension of its operations, including but not limited to expenses incurred for reconfiguration to outside dining and increased sanitation procedures.  [La Cava] would not have incurred those costs but for the direct physical loss or damage caused by the coronavirus, COVID-19, and the [government] Orders."

On March 18, 2020, two days after its initial suspension of operations, La Cava submitted a claim to Century-National by telephone for the income lost as a result of the virus and the related government orders.  As alleged, Century-National "undertook no steps to determine whether the virus had caused physical damage to the La Cava premises."  Instead, "without engaging in any legitimate, true, meaningful, or thorough investigation, [Century-National] denied [La Cava's] claim." Specifically, on April 9, 2020 Century-National (through its claims adjuster) responded in a letter stating the business income coverage did not apply to the claim because "[t]he suspension of your business was not caused by a 'direct physical loss of or

7

damage to property' at your designated premises" and "[t]he government directives at issue did not 'prohibit access' to your designated premises and did not result from a loss or damage at . . . premises 'other than' your designated premises." (Capitalization omitted.)

La Cava's first cause of action for declaratory judgment sought a declaration that Century-National was obligated to provide coverage for losses incurred in connection with La Cava's COVID-19-related claims. The second cause of action for breach of contract alleged La Cava "suffered the direct physical loss of property and lost business income following California's Stay at Home Order and due to the presence of the coronavirus in and around its premises—losses which were covered under the Policy purchased from [Century-National]." These losses included "loss of and damage to some or all of [La Cava's] covered property and its functionality, which became useless, dangerous, or uninhabitable, resulting in substantial loss of business income, lost revenue from having to suspend or limit its operations, and extra expenses incurred to mitigate the suspension of its operations." The complaint also alleged there were no relevant policy exclusions, and La Cava complied with the terms and conditions of the policy.

The third cause of action for breach of the implied covenant of good faith and fair dealing alleged Century-National engaged in bad faith by, among other things, denying La Cava's claim without undertaking steps to determine whether the virus had caused physical damage to the premises, "[u]nreasonably refusing to conduct a thorough investigation of [La Cava's] claims, and ignoring evidence that supports coverage instead of inquiring into possible bases that might support [La Cava's]

8

claim." The fourth cause of action for violation of the UCL, pleaded as a class claim,[2] alleged Century-National engaged in unlawful conduct in violation of Insurance Code section 790 et seq. by categorically denying La Cava's and other class members' claims without a fair investigation.

C.    *Century-National's Demurrer*

On April 14, 2021 Century-National filed a demurrer to the first amended complaint.[3] Century-National argued that under California law, the phrase "direct physical loss or damage to property" in an insurance contract requires a physical alteration of the insured property, but La Cava did not and could not allege its loss of business income was attributable to any physical alteration of La Cava's property by the COVID-19 virus. In support of its position, Century-National cited nearly two dozen decisions from federal district courts in California holding business closures due to the COVID-19 virus or related government orders did not result from direct physical loss of or damage to property and dismissing the insured's claims based on the denial of coverage. In addition, the civil authority coverage under the policy did not cover the losses because the government shutdown orders did not prohibit access to La Cava's premises and were not issued "due to direct physical loss or damage to

---

[2]    The class allegations are not at issue in this appeal.

[3]    On February 19, 2021 the trial court sustained Century-National's demurrer to the original complaint with leave to amend. The original complaint did not include the allegations that since March 2020 three of La Cava's employees and many of its customers and the employees of nearby businesses tested positive for the COVID-19 virus.

property" at La Cava, as provided in the policy. Further, Century-National did not act in bad faith because it properly denied coverage based on an "undeniably" genuine dispute as to the existence of coverage as shown by the fact "nearly every judge in California to consider the coverage issues herein has found no coverage for these COVID-19 business-interruption claims."

After a hearing, on June 2, 2021 the trial court sustained Century-National's demurrer without leave to amend. Citing five federal district court decisions in California denying coverage and observing that "substantially all of the federal district courts" were in agreement, the court found, "[C]ourts have routinely held, and this Court agrees, that the existence of COVID-19 in the air or on surfaces does not constitute 'direct physical loss of or damage to property' within the meaning of the insurance policy." Accordingly, La Cava's allegations were insufficient as a matter of law to establish a covered loss. Civil authority coverage did not apply for the additional reason that La Cava failed to allege facts demonstrating it was "prohibited from accessing its building." Because La Cava could not allege it was entitled to coverage under any provision of the policy, all four causes of action failed, and La Cava had not demonstrated a basis for leave to amend. The court entered a judgment of dismissal on June 16, 2021.

La Cava timely appealed.

## DISCUSSION

A. *Standard of Review*

"'In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges

10

facts sufficient to state a cause of action under any legal theory.'" (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 768; accord, *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.) When evaluating the complaint, "we assume the truth of the allegations." (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 209; accord, *Lee v. Hanley* (2015) 61 Cal.4th 1225, 1230.) "However, we are not required to accept the truth of the factual or legal conclusions pleaded in the complaint." (*Marina Pacific Hotel and Suites, LLC v. Fireman's Fund Insurance Company* (2022) 81 Cal.App.5th 96, 105 (*Marina Pacific*); accord, *Mathews*, at p. 768 ["'"'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.'"'"].)

B.    *Interpretation of Insurance Contracts*

"In general, interpretation of an insurance policy is a question of law that is decided under settled rules of contract interpretation." (*State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 194; accord, *Marina Pacific, supra*, 81 Cal.App.5th at p. 105.) "The principles governing the interpretation of insurance policies in California are well settled. 'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. [Citations.] "If contractual language is clear and explicit, it governs." [Citations.] If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect "'the objectively reasonable expectations of the insured.'" [Citations.] Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer.'" (*Minkler v. Safeco Ins. Co. of*

11

*America* (2010) 49 Cal.4th 315, 321; accord, *Montrose Chemical Corp. of California v. Superior Court* (2020) 9 Cal.5th 215, 230; *Marina Pacific*, at p. 105.)

"The 'tie-breaker' rule of construction against the insurer stems from the recognition that the insurer generally drafted the policy and received premiums to provide the agreed protection." (*Minkler v. Safeco Ins. Co. of America, supra*, 49 Cal.4th at p. 321; accord, *Marina Pacific, supra*, 81 Cal.App.5th at p. 106.) "To further ensure that coverage conforms fully to the objectively reasonable expectations of the insured, . . . in cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer. The insured has the burden of establishing that a claim, unless specifically excluded, is within basic coverage, while the insurer has the burden of establishing that a specific exclusion applies." (*Minkler*, at p. 322; accord, *Montrose Chemical Corp. of California v. Superior Court, supra*, 9 Cal.5th at p. 230; *Marina Pacific*, at p. 106.)

C.    *Coverage for COVID-19 Pandemic-related Losses*

At the time the trial court sustained the second demurrer, no California appellate court had addressed whether business losses caused by the COVID-19 pandemic were covered by commercial property insurance. Multiple California appellate courts have now addressed this question, but with differing results. In *Marina Pacific, supra*, 81 Cal.App.5th 96, we addressed whether the owners of an insured restaurant and hotel had sufficiently pleaded they had suffered "direct physical loss of or damage to" the property supporting coverage under a

12

commercial property insurance policy based on allegations of contamination of the insured premises with the COVID-19 virus.[4] We concluded they had.

In *Marina Pacific*, the owners sued their insurer for breach of contract and related claims after the insurer denied coverage for losses claimed as a result of the COVID-19 pandemic. (*Marina Pacific, supra*, 81 Cal.App.5th at p. 102.) The policy provided business interruption coverage for "'the actual loss of business income and necessary extra expense you sustain due to the necessary suspension of your operation during the period of restoration arising from direct physical loss or damage to [covered] property.'"[5] (*Id.* at p. 99.) As we explained, the owners'

_____

[4] Our decision in *Marina Pacific* was filed on July 13, 2022, after La Cava's reply brief was filed. Century-National addressed our decision in its July 26 answer to the amicus brief filed by United Policyholders in support of La Cava, and the American Property and Casualty Insurance Association and the National Association of Mutual Insurance Companies addressed the decision in their amicus brief in support of Century-National, also filed on July 26, 2022. On July 27 we invited the parties to address *Marina Pacific* in any answer to an amicus brief or a supplemental brief. La Cava addressed our decision in its August 15 answer.

[5] The policy at issue in *Marina Pacific* also included "'communicable disease coverage'" for "'direct physical loss or damage' to insured property 'caused by or resulting from a covered communicable disease event,' including costs necessary to repair or rebuild insured property damaged or destroyed by the communicable disease and to '[m]itigate, contain, remediate, treat, clean, detoxify, disinfect, neutralize, cleanup, remove, dispose of, test for, monitor and assess the effects [of] the communicable disease.'" (*Marina Pacific, supra*, 81 Cal.App.5th

13

complaint alleged the COVID-19 virus "not only lives on surfaces but also bonds to surfaces through physicochemical reactions involving cells and surface proteins, which transform the physical condition of the property. The virus was present on surfaces throughout the insured properties, including the hotel lobby, kitchens at both the hotel and restaurant, employee breakroom, service elevator and parking garage, as well as on the properties' food, bedding, fixtures, tables, chairs and countertops. Because of the nature of the pandemic, the virus was continually reintroduced to surfaces at those locations. As a direct result, the [owners] were required to close or suspend operations in whole or in part at various times and incurred extra expense as they adopted measures to restore and remediate the air and surfaces at the insured properties. The [owners] specifically alleged they were required to 'dispose of property damaged by COVID-19 and limit operations at the Insured Properties.'" (*Id.* at pp. 108-109.)

Based on these allegations, we reversed the trial court's order sustaining the insurer's demurrer without leave to amend. (*Marina Pacific, supra*, 81 Cal.App.5th at p. 114.) We assumed for purposes of our opinion that the undefined policy term "direct physical loss or damage" meant the owners needed to allege an external force acted on the insured property causing a "distinct, demonstrable, physical alteration of the property," as stated in *MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.* (2010) 187 Cal.App.4th 766 (*MRI Healthcare*). (See

---

at p. 100.) The communicable disease coverage also covered losses from the suspension of operations "'due to direct physical loss or damage to property at a location caused by or resulting from a covered communicable disease event.'" (*Ibid.*) The policy at issue here does not contain a similar provision.

14

*Marina Pacific*, at p. 108; *MRI Healthcare*, at pp. 770, 779 [failure of MRI machine to function after it was demagnetized to enable roof repair following storms was not a covered loss because "there was no 'distinct, demonstrable [or] physical alteration' of the MRI machine"].)

We concluded the complaint adequately alleged physical alteration of the premises, explaining, "Assuming, as we must, the truth of those allegations, even if improbable, absent judicially noticed facts irrefutably contradicting them, the insureds have unquestionably pleaded direct physical loss or damage to covered property within the definition articulated in *MRI Healthcare*—a distinct, demonstrable, physical alteration of the property." (*Marina Pacific, supra,* 81 Cal.App.5th at p. 109.) We recognized our holding was at odds with many federal district court decisions dismissing claims for pandemic-related business losses. (*Ibid.*) But those cases did not involve similar factual allegations, and to the extent they were analogous, federal pleading standards, unlike California's, permitted the district courts to dismiss the claims. (*Id.* at pp. 109-110.) We observed, "Unlike in federal court, the plausibility of the insureds' allegations has no role in deciding a demurrer under governing state law standards, which . . . require us to deem as true, 'however improbable,' facts alleged in a pleading—specifically here, that the COVID-19 virus alters ordinary physical surfaces transforming them into fomites through physicochemical processes, making them dangerous and unusable for their intended purposes unless decontaminated.'" (*Marina Pacific*, at pp. 109-110; see *Hacker v. Homeward Residential, Inc.* (2018) 26 Cal.App.5th 270, 280 [in considering the merits of a demurrer,

"'the facts alleged in the pleading are deemed to be true, however improbable they may be'"].)

We also addressed three published Court of Appeal decisions that had addressed pandemic coverage, each affirming an order sustaining the insurer's demurrer. We concluded *Musso & Frank Grill Co., Inc. v. Mitsui Sumitomo Ins. USA Inc.* (2022) 77 Cal.App.5th 753 and *Inns-by-the-Sea v. California Mutual Ins. Co.* (2021) 71 Cal.App.5th 688 (*Inns-by-the-Sea*) were distinguishable because both involved only allegations of loss of use of the insured property as a result of government-ordered closures to limit the spread of COVID-19, "rather than, as expressly alleged here, a claim the presence of the virus on the insured premises caused physical damage to covered property, which in turn led to business losses." (*Marina Pacific, supra*, 81 Cal.App.5th at p. 110; see *Musso & Frank*, at pp. 758-759 [policy requiring physical loss or damage to property did not cover losses incurred as a result of pandemic-related order mandating that restaurants close by midnight]; *Inns-by-the-Sea*, at p. 703 ["Inns alleges that it ceased operations 'as a direct and proximate result of the Closure Orders.' It does not make the proximate cause allegation based on the particular presence of the virus on its premises."].)[6]

---

[6] As argued by amicus curiae United Policyholders, the Fourth District in *Inns-by-the-Sea, supra*, 71 Cal.App.5th at page 710 observed that "a virus could cause a suspension of operations through direct physical loss of or damage to property," and noted that "case law supports the view that . . . an invisible substance or biological agent might give rise to coverage because it causes a policyholder to suspend operations due to direct physical loss of or damage to property." (*Id.* at p. 710, fn. 21.)

16

We recognized the decision by our colleagues in Division Four of this district in *United Talent Agency v. Vigilant Ins. Co.* (2022) 77 Cal.App.5th 821 was not distinguishable in that it presented similar allegations to those at issue in *Marina Pacific*. (*Marina Pacific, supra*, 81 Cal.App.5th at p. 111.) In *United Talent*, the Court of Appeal affirmed an order sustaining the insurer's demurrer, concluding allegations that the presence of the COVID-19 virus on property constituted direct physical loss or damage were insufficient as a matter of law to trigger coverage because "the virus exists worldwide wherever infected people are present, it can be cleaned from surfaces through general disinfection measures, and transmission may be reduced or rendered less harmful through practices unrelated to the property, such as social distancing, vaccination, and the use of masks. Thus, the presence of the virus does not render a property useless or uninhabitable, even though it may affect how people interact with and within a particular space." (*United Talent*, at p. 838.) We rejected this approach, reasoning, "We are not authorized to disregard those allegations when evaluating a demurrer . . . based on a general belief that surface cleaning may be the only remediation necessary to restore contaminated

---

Although such allegations were absent in *Inns-by-the-Sea*, the court noted, "'It could be a different story if a business—which could have otherwise been operating—had to shut down because of the presence of the virus within the facility. For example, a restaurant might need to close for a week if someone in its kitchen tested positive for COVID-19, requiring the entire facility to be thoroughly sanitized and remain empty for a period. Perhaps the restaurant could successfully allege that the virus created physical loss or damage in the same way some chemical contaminant might have.'" (*Id.* at pp. 704-705.)

property to its original, safe-for-use condition." (*Marina Pacific*, at p. 111.) Moreover, "[e]ven if there had been evidence subject to proper judicial notice to establish that disinfecting repaired any alleged property damage, it would not resolve whether contaminated property had been damaged in the interim, nor would it alleviate any loss of business income or extra expenses. . . . [T]he duration of exposure may be relevant to the measure of policy benefits; it does not negate coverage." (*Id.* at p. 112.)

Since our *Marina Pacific* decision, Division Two of the First District has published two opinions addressing COVID-19 pandemic-related losses under policies providing coverage for direct physical loss of or damage to property. In *Apple Annie, LLC v. Oregon Mutual Ins. Co.* (2022) 82 Cal.App.5th 919, 925, the Court of Appeal affirmed an order sustaining the insurer's demurrer, holding a restaurant owner failed to allege direct physical loss of or damage to its restaurant where the owner alleged only that its business losses were due to suspension of operations under state and county orders. In supplemental briefing after *Marina Pacific* was decided, the owner acknowledged *Marina Pacific* "'does not directly implicate [the owner's] theory of coverage,'" but it argued there was a reasonable possibility it could amend its complaint to include allegations similar to those in *Marina Pacific*. (*Id.* at pp. 936-937.) However, because at oral argument the owner's attorney stated as an officer of the court he could not state what facts he could allege in an amended complaint, the Court of Appeal concluded the owner did not meet its burden to obtain leave to amend. (*Id.* at p. 936.) In *Tarrar Enterprises, Inc. v. Associated Indemnity Corp.* (2022) 83 Cal.App.5th 685, 688-689, the Court of

Appeal held that although the trial court properly sustained the insurer's demurrer because the insured had not alleged direct physical loss of or damage to property, the court abused its discretion in denying leave to amend because the insured's appellate briefs set forth "in some detail" the proposed amendments.[7]

D.  *The Trial Court Erred in Sustaining the Demurrer*

    1.  *La Cava adequately stated causes of action for breach of contract and declaratory judgment based on alleged direct physical loss or damage to its property caused by the COVID-19 virus*

On appeal, La Cava contends the alleged contamination of its restaurant by the COVID-19 virus constituted a "physical change" sufficient to trigger coverage under the Century-National policy.  Century-National and amici curiae argue the policy language providing coverage for a direct physical loss of or damage to property required a distinct, demonstrable, physical alteration of the property.  Even assuming La Cava was required to allege a distinct, demonstrable physical alteration of the property to show coverage under the policy (as stated in *MRI*

---

[7]  In *Amy's Kitchen, Inc. v. Fireman's Fund Ins. Co.* (2022) 83 Cal.App.5th 1062, 1070-1071, Division Four of the First District interpreted a policy providing coverage for a communicable disease event not to require physical alteration of the premises because the policy language specifically referred to coverage for the costs to disinfect, cleanup, and remove the communicable disease.  The Court of Appeal reversed the trial court order, holding the court should have granted leave to amend to plead a communicable disease event.  (*Id.* at pp. 1072-1073.)

19

*Healthcare, supra*, 187 Cal.App.4th at page 779),[8] the allegations of the complaint were sufficient.

The first amended complaint alleged the virus was "certain to have been present at La Cava at various times," including "in the form of virus matter present on walls, floors, tables, chairs, silverware, dishes, and other surfaces." As alleged, this was because thousands of people visited La Cava in the weeks preceding the shutdown, and based on the spread of the pandemic, it was "beyond doubt that some—likely many—of them were infected with the virus and breathed virus matter onto surfaces at La Cava." Further, since March 2020 La Cava had patrons who subsequently tested positive for COVID-19 and who had the ability to use the restrooms although they were dining outside, and three employees contracted COVID-19 in late December 2020 and January 2021. (See *Marina Pacific, supra*, 81 Cal.App.5th at p. 108 [owners alleged virus "was present on surfaces throughout the insured properties"].)

The complaint also alleged health authorities and medical scientists advised that the virus "can remain on smooth surfaces for at least 28 days," and it "adheres to, attaches to and alters the surfaces of the property and surfaces" it comes into contact with, creating "fomites," which are "objects, previously safe to touch,

---

[8]    In its opening brief, La Cava argued the policy term "direct physical loss of or damage to" should not be interpreted to require a physical alteration, and the interpretive rule adopted in *MRI Healthcare, supra*, 187 Cal.App.4th 766 should be limited to cases involving intangible changes to personal property, not real property. However, La Cava acknowledged in its supplemental briefing that "in light of *Marina Pacific Hotel*'s holding that identical circumstances to La Cava's satisfy this standard, the dispute is no longer relevant."

20

that now serve as agents and mechanism for transmission of deadly, infections viruses and diseases." (See *Marina Pacific, supra*, 81 Cal.App.5th at p. 101 [owners alleged COVID-19 virus "'actually bonds and/or adheres to such objects through physico-chemical reactions'" and "'caus[es], among other things, a distinct, demonstrable or physical alteration to property'"].) "Cleaning of surfaces alone is insufficient," and safe operations would require "substantial physical alterations, systems changes to facilities, and new protocols for air circulation, disinfection, and disease prevention." Because routine cleaning was insufficient, "[t]he presence of droplets containing coronavirus at La Cava led to its closure and constitute[d] covered physical damage to [La Cava's] premises." As a result, La Cava lost business revenues and incurred substantial costs to mitigate the damage by reconfiguring its property and increasing its sanitization procedures. (See *Marina Pacific*, at pp. 108-109 [owners "were required to close or suspend operations in whole or in part at various times and incurred extra expense as they adopted measures to restore and remediate the air and surfaces at the insured properties"].)

As discussed, the trial court found these allegations were not sufficient as a matter of law, relying on federal decisions ruling out the possibility of covered losses and the absence of authority supporting La Cava's position. We disagree with the court's reasoning, as stated in its order sustaining the demurrer to the original complaint, that La Cava could not show the COVID-19 virus permanently damages surfaces because "it is well-known that SARS-CoV-2 surface contamination is ephemeral, and [La Cava] has not presented the Court with any authority holding that an ephemeral, pathogenic surface

21

contamination qualifies as 'damage to' property under this or similar policies." As we discussed in *Marina Pacific, supra*, 81 Cal.App.5th at page 109, the insured is not required to provide authority at the pleading stage to support its position that contamination with the COVID-19 virus caused damage to the surfaces in its premises.

In its answer to the amicus brief filed by United Policyholders, Century-National argues *Marina Pacific* embodies a "narrow exception" to the general rule that pandemic-related damages are not recoverable under business loss coverage, and it urges us instead to follow the skeptical approach taken by Division Four of this district in *United Talent Agency v. Vigilant Ins. Co., supra*, 77 Cal.App.5th 821. We see no reason to deviate from our decision in *Marina Pacific*, which did not carve out simply a "narrow exception," as suggested by Century-National. Further, as discussed, the policy provisions at issue in *Marina Pacific* are not materially different from those in the Century-National policy.[9] Although Century-National is correct that we

9 Amici curiae American Property and Casualty Insurance Association and the National Association of Mutual Insurance Companies seek to distinguish *Marina Pacific* on similar grounds. They also contend that allowing La Cava's complaint to proceed would destabilize insurance markets by upholding claims for losses due to any regulation that limits a business's operations, such as a noise ordinance mandating early closure or a fire regulation reducing occupancy and requiring reconfiguration. We are unpersuaded. These types of regulations would not involve allegations that "an external force acted on the insured property causing a physical change in the condition of the property," as alleged by La Cava with respect to the COVID-19 virus contamination of its restaurant. (*Marina Pacific, supra*,

considered the communicable diseases coverage in construing the policy language in *Marina Pacific*, we concluded there was a sufficient, independent basis for lost business income coverage under the policy provision for losses due "to the necessary suspension of your operation during the period of restoration arising from direct physical loss or damage to [covered] property." (*Id*. at pp. 109, 112.)

Century-National's argument that La Cava shut down because of the government closure orders, and not the COVID-19 pandemic fares no better. Century-National points to La Cava's allegation in paragraph 81 that "[o]nce the La Cava management was made aware by the Orders of the clear and present danger of the virus and its existence everywhere in LA County, including on the surfaces and in the air in and around La Cava's premises, it promptly shut down operations." Although this allegation references the government orders, a fair reading of the allegation is that it was the orders that apprised La Cava of the existence and danger of the COVID-19 virus, not that the shut down happened as a result. Moreover, as alleged, the City of Los Angeles Mayor's May 15 public health order prohibited restaurants from serving food on site, limiting restaurants to delivery, pickup, or drive-through service of customers, but it did not require restaurants to shut down entirely. To the extent the

---

81 Cal.App.5th at p. 107; accord, *MRI Healthcare, supra*, 187 Cal.App.4th at p. 779.) Moreover, to the extent amici contend we should interpret the Century-National and similar policies not to apply to COVID-19 virus contamination for policy reasons, that is an argument best made to the Legislature, not directed to our review of the adequacy of the allegations in the first amended complaint.

23

complaint alleges La Cava initially shut down for two weeks, then modified its operations, due to the COVID-19 virus and the government orders, it is a question of fact for a summary judgment motion or trial whether the restaurant closure and modifications resulted from damage caused by the COVID-19 virus or the government orders.

Because La Cava sufficiently pleaded direct physical loss or damage to its property caused by the COVID-19 virus to trigger coverage, the trial court erred in sustaining the demurrer to the causes of action for breach of contract and declaratory judgment. "'[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff.'" (*Marina Pacific, supra,* 81 Cal.App.5th at p. 108; accord, *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) Century-National's demurrer challenged only the third element, contending it did not breach its obligation to pay benefits under the policy because La Cava failed to allege damage to or loss of La Cava's premises within the meaning of the policy.[10] And the parties' coverage dispute is clearly a proper basis for a declaratory judgment cause of action. (Code Civ. Proc., § 1060 ["Any person interested . . . under a contract . . . may, in cases of actual controversy relating

---

[10] Because we conclude La Cava alleged loss of business income caused by direct physical loss of or damage to its property, we do not reach whether La Cava adequately alleged entitlement to civil authority coverage, which under the policy required government action that "prohibits access to the premises due to direct physical loss of or damage to the property, other than at the described premises . . . ."

24

to the legal rights and duties of the respective parties, bring an original action . . . for a declaration of his or her rights and duties . . . , including a determination of any question of construction or validity arising under the . . . contract."]; see *Lee v. Silveira* (2016) 6 Cal.App.5th 527, 546 [declaratory relief claimant must show "two essential elements: '(1) a proper subject of declaratory relief, and (2) an actual controversy involving justiciable questions relating to the rights or obligations of a party'"].)

2.  *La Cava adequately alleged causes of action for bad faith and violation of the UCL based on Century-National's summary denial of its insurance claim*

As discussed, Century-National argued in its demurrer that even if the trial court were to find La Cava adequately alleged breach of the policy, La Cava could not state a claim for breach of the covenant of good faith and fair dealing because there was a genuine dispute over policy coverage in light of the fact "nearly every judge in California" that had considered the question of coverage for COVID-19-related business losses found no coverage. Although the trial court did not reach this argument, Century-National contends on appeal the complaint independently failed to state a claim for bad faith because the denial of La Cava's insurance claim turned on a disputed interpretation of the policy. La Cava has adequately alleged causes of action for bad faith and violation of the UCL.[11]

---

[11]     Century-National does not dispute that allegations sufficient to support a cause of action for breach of the covenant of good faith and fair dealing are also sufficient to support a claim for violation of the UCL.  (See *Zhang v. Superior Court* (2013)

25

"[I]n a claim against an insurance carrier, 'there are at least two separate requirements to establish breach of the implied covenant [of good faith and fair dealing]: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause.'" (*Grebow v. Mercury Ins. Co.* (2015) 241 Cal.App.4th 564, 581; accord, *Tilbury Constructors, Inc. v. State Comp. Ins. Fund* (2006) 137 Cal.App.4th 466, 475.) It is "settled law in California that an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 347; accord, *Case v. State Farm Mutual Automobile Ins. Co., Inc.* (2018) 30 Cal.App.5th 397, 402.) "[W]here there is a *genuine* issue as to the insurer's liability under the policy . . . , there can be no bad faith liability imposed on the insurer for advancing its side of that dispute." (*Chateau Chamberay*, at p. 347; accord, *Case*, at p. 402.)

However, "'[t]he genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate,

---

57 Cal.4th 364, 380 ["[B]ad faith insurance practices may qualify as any of the three statutory forms of unfair competition. They are unlawful; the insurer's obligation to act fairly and in good faith to meet its contractual responsibilities is imposed by the common law, as well as by statute. They are unfair to the insured; unfairness lies at the heart of a bad faith cause of action. They may also qualify as fraudulent business practices."], citations and footnote omitted.)

process and evaluate the insured's claim.  A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds.'" (*Ghazarian v. Magellan Health, Inc.* (2020) 53 Cal.App.5th 171, 186.)  "'"[T]he reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact, [but] becomes a question of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence."'" (*Hedayati v. Interinsurance Exchange of the Automobile Club* (2021) 67 Cal.App.5th 833, 843; accord, *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co., supra,* 90 Cal.App.4th at p. 350 [affirming summary adjudication of bad faith claim in favor of insurer where insured offered only a two-page expert declaration expressing conclusory opinion the insurer had not conducted an adequate and thorough investigation of loss].)

The first amended complaint alleged Century-National "undertook no steps to determine whether the virus had caused physical damage to the La Cava premises," and "without engaging in any legitimate, true, meaningful, or thorough investigation," it summarily denied the claim.  Further, Century-National responded to La Cava's policy claim with what "appears to be a form letter sent in response to business income claims arising from [government shutdown orders]" stating, in relevant part, "The suspension of your business was not caused by a 'direct physical loss of or damage to property' at your designated premises."

Century-National does not challenge the sufficiency of the allegations it failed to conduct any investigation of La Cava's claim; rather, it contends its denial was based on a disputed

27

interpretation of the policy.  But a genuine dispute foreclosing a bad faith claim exists only where the insurer's position is maintained "in good faith and on reasonable grounds." (*Ghazarian v. Magellan Health, Inc., supra*, 53 Cal.App.5th at p. 186.)  At the pleadings stage, Century-National's denial of coverage just three weeks after La Cava tendered its claim and in the earliest days of our understanding of the novel COVID-19 virus, cannot be deemed as a matter of law to have been made in good faith with reasonable grounds.  Century-National treats *Marina Pacific* as a sea change in the law and characterizes its own position in April 2020 as clearly justified by the later endorsement of that position by numerous district courts.  But at the time, it was settled law that environmental contamination that resulted in physical damage could trigger business income coverage.  (See *Inns-by-the-Sea, supra*, 71 Cal.App.5th 688, 703 [surveying pre-pandemic cases recognizing an insured could allege "the COVID-19 virus—like smoke, ammonia, odor, asbestos—is a physical force" and was present on insured premises and directly caused damage].)  La Cava alleged COVID-19 was present and physically damaged its restaurant, and it alleged its insurance claim was not limited to civil authority coverage.  And, as alleged, Century-National did not take any steps to determine whether COVID-19 caused physical damage to the La Cava premises before denying coverage.

### DISPOSITION

The judgment is reversed.  The matter is remanded for the trial court to vacate its order sustaining the demurrer without

28

leave to amend and to enter a new order overruling the demurrer.  La Cava is to recover its costs on appeal.


                                    FEUER, J.

We concur:


        PERLUSS, P. J.


        SEGAL, J.

Filed 1/5/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SHUSHA, INC., | B313907 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV25769) |
| v. | |
| CENTURY-NATIONAL INSURANCE COMPANY, | ORDER CERTIFYING OPINION FOR PUBLICATION (NO CHANGE IN THE APPELLATE JUDGMENT) |
| Defendant and Respondent. | |

THE COURT:

The opinion in this case filed December 14, 2022 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the requests by Amicus Curiae United Policyholders and Endeavor Operating Company, LLC, for publication pursuant to California Rules of Court, rule 8.1120(a) are granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

_____

PERLUSS, P. J.          SEGAL, J.          FEUER, J.